**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

FILED IN CLERKS OFFICE

| | |
|---|---|
| GARY CIFIZZARI,<br>Plaintiff<br><br>v.<br><br>TOWN OF MILFORD, FORMER MILFORD POLICE OFFICERS VINCENT LIBERTO, JOHN CHIANESE, FORMER MILFORD POLICE SGT'S. ANTHONY DIGIROLAMO AND DONALD SMALL,  AS WELL AS-YET UNKNOWN POLICE OFFICERS AND ADDITIONAL  AS-YET  UNKNOWN POLICE  SUPERVISORS,  HEREIN REFERRED TO AS JOHN AND JANE DOES 1-20 | **JURY TRIAL DEMANDED** |

## COMPLAINT

NOW COMES Plaintiff, Gary Cifizzari, by his attorney, William S. Smith, Esq. of The Law Office of William S. Smith, and complaining of the above-named Defendants, as well as other as-yet unknown police officers and police supervisors acting under color of state law, hereby alleges as follows:

## PRELIMINARY STATEMENT

1. How does a person do who was falsely and repeatedly labeled, "murderer," for some 35 years of his life on earth obtain justice?   This Complaint opens the door to the answer. As a direct result of doctored and suppressed reports, false forensic testimony, coerced and unreliable witness statements, improper identification procedures, false forensic testimony, and a general pattern of blatant disregard for the law and the United States Constitution on the part of the

1

Defendants, Plaintiff Gary Cifizzari ("Plaintiff") spent some 35 years in prison for a murder he did not commit, and with which he had all of nothing to do.

2. Plaintiff was wrongfully convicted and sentenced to life in prison without the possibility of parole and this despite not a scintilla of physical or other evidence tying him to the murder. The sole basis for the Commonwealth's case for guilt was bitemark evidence that was decades later retracted.

3. Plaintiff continued to assert his innocence for over three decades. Through persistence and a dogged determination to reveal the truth, Plaintiff eventually obtained proof of egregious misconduct by the Defendants.

4. In 2019, Plaintiff moved for a new trial based on newly discovered evidence. The Commonwealth of Massachusetts (the "Commonwealth") joined in the motion to vacate his conviction. That motion was granted on December 10, 2019, and the Commonwealth *nolle prossed* all of the indictments against Plaintiff.

5. Among other misdeeds set forth in this Complaint, the Milford Police Department ("Milford PD") violated Plaintiff's constitutional rights by, inter alia, improperly obtaining witness statements in an effort to fabricate Plaintiff's guilt. The Town of Milford and Milford PD also withheld and doctored key exculpatory evidence. These constitutional violations facilitated the presentation of the false evidence to a jury, which resulted in the erroneous conviction of Plaintiff.

6. The egregious constitutional violations resulted in Plaintiff having been forced to spend decades without his family. Plaintiff was forced to miss weddings, funerals, births, graduations, birthdays, and other monumental life events.

7.      While he can never regain the approximately 35 years that were taken from him as a result of the misconduct described herein, Plaintiff is entitled, pursuant to 42 U.S.C. §§ 1983 and 1988 and state law, to monetary damages for the extraordinary injuries suffered as a result of Plaintiff's mortifying and shocking wrongful arrest, prosecution, conviction, and 35-year imprisonment.

## JURISDICTION AND VENUE

8. This action is brought pursuant to, inter alia, 42 U.S.C. § 1983, to redress the deprivation, under color of law, of Plaintiff's rights as secured by the Constitution and laws of the United States.

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

10. Venue is proper under 28 U.S.C. § 1391(b), as the events giving rise to the claims asserted herein occurred in this district and numerous Defendants reside in this district.

## THE PARTIES

11. At all times relevant to this Complaint until his incarceration, Plaintiff was a resident of Massachusetts. At the time of the arrest giving rise to this action, Plaintiff was living in that same location.

12. Defendant Town of Milford is located in the County of Worcester, and is a municipal corporation of the Commonwealth of Massachusetts.

13. Upon information and belief, at all times relevant to this Complaint, Defendants Vincent Liberto, John Chianese, and Sgt. Anthony Digirolamo were employed by the Milford Police Department and acting under color of law.

14.     Defendants John and Jane Does 1 through 10, whose identities are currently

3

unknown, represent individuals acting under color of law who had personal involvement in the investigation of Plaintiff (the "Doe Defendants").

15. Defendants John and Jane Does 11 through 20, whose identities are currently unknown, represent those employees who supervised certain Defendants and had personal involvement in the investigation of Plaintiff (the "Supervisory Doe Defendants").

16. Each of the foregoing Defendants in the above Paragraphs are sued in their individual capacities, and all acted under color of law while engaging in the actions alleged in this Complaint.

## FACTS

17. Milford resident, Concetta Schiappa, was last seen alive by her next-door neighbor at around 9 p.m. on Friday, September 28, 1979.   She was discovered lying dead on her living room floor the following morning.

18. There was bruising on the right lower part of her stomach and on the inside of her upper left leg, which experts for the prosecution via the Worcester County District Attorney's office later claimed at trial to be human bitemarks.

19. The Milford Police Department investigated the murder. Photo and fingerprint technicians took numerous photographs of the inside and the outside of the apartment and searched for latent fingerprints, including removing and testing window shades that had been pulled down by the perpetrator.   Policed removed for analysis the rug underneath the victim's body, the pillow that was lying over her arm, a pair of the victim's slippers, and "numerous other items which were around the body," including fragments of the mop used to kill Ms. Schiappa.   In addition, Ms.

4

Schiappa's black pocketbook and set of keys were found in a yard two streets away from her apartment.

20. Prior to and during the autopsy, Dr. Stanley Schwartz, a forensic dental examiner, examined, and photographed the bruising on the victim. He would later testify at the Plaintiff's trial. He also attempted to take an impression of the mark on the victim's abdomen using a rubber base material.

21. The crime lab analysis itself, however, did not result in any evidence being introduced at the plaintiff's trial.

22. The Milford Police knew very early on that the real perpetrator, Michael Giroux, had both the motive and opportunity to commit this crime, but utterly failed to adequately investigate him. Neither Mr. Cifizzari nor his brother Michael Cifizzari—Ms. Schiappa's great nephews— was a suspect at this stage of the police investigation. Although none of the people interviewed by the police had useful information regarding the identity of the perpetrator, the Milford Police initially focused on several suspects—including Michael Joseph Giroux, whose DNA was decades later found to match and/or be consistent with the semen on the victim's nightgown.

23. The police had several reasons to suspect Mr. Giroux. About one year prior to the murder, the victim, Ms. Schiappa, had accused Mr. Giroux of entering her home without permission and stealing cash from the top of her dresser.

24. Further, approximately just two weeks prior to the murder, Mr. Giroux had come uninvited to Mr. Terhune's and Ms. Duncan's apartment shortly after being discharged from the United States Army. A scant one or two days after the murder, Mr. Giroux overdosed on drugs and was admitted to the VA hospital in Jamaica Plain.

25. The Milford and State police were aware that Mr. Giroux had a prior criminal record.

5

26. They also interviewed him at least twice. In his statements to the police, Mr. Giroux placed himself within just 200 yards of Ms. Schiappa's residence at approximately the time of the murder. Mr. Giroux stated that, on the evening of September 28, 1979, he went to a bar called Lonergan's, which was located at 5 Central Street, a two-minute walk to Ms. Schiappa's apartment at 72 Central Street. Mr. Giroux told the police that he became "very drunk, so drunk that he said he had trouble talking" and that, after leaving Lonergan's, he walked back to his brother David's house at 10 Genoa Avenue in Milford. Mr. Giroux said that he cut "through Stone's parking lot because he did not want to walk on Main Street and be seen," and that he then went "down Jefferson St—up street behind Town Hall," The walking route from Lonergan's through Stone's parking lot (located at 32 Central Street) to Jefferson Street to 10 Genoa Avenue passes directly by Ms. Schiappa's residence and the 23 Spring Street location where Ms. Schiappa's pocketbook and keys were ultimately found after the murder.

27. For example, in his initial statement on October 5, 1979, Mr. Giroux stated that he "went right home and went to sleep." In the second statement on October 24, 1979, however, he said that he got home and "turned on TV...." Mr. Giroux also admitted that he had changed his clothes, telling the police that his brother David gave him clothes that day ("a brown shirt, a plaid pair of pants and brown socks"), raising the obvious question of whether Mr. Giroux needed to discard his clothes because they were stained with Ms. Schiappa's blood. In addition, Mr. Giroux's brother, David Giroux, is certain that he never owned plaid pants. In the same discussion with police, Mr. Giroux volunteered the strange non-sequitur that "he couldn't stand the sight of blood," which his brother explained was not true.

28. Despite the manifest inconsistencies in Mr. Giroux's statements and significant reasons to suspect him, the Milford Police Department or any other law enforcement entity took no further

steps to investigate him or pursue him as a suspect. There is no evidence of which Plaintiff is aware that they interviewed anyone else regarding Mr. Giroux's whereabouts on the night of the murder, including his brother, David, who would have been his alibi witness. There is also no evidence that the police searched David Giroux's home, where Michael Giroux was staying, to search for the clothes that Michael Giroux admitted he had discarded the night of the murder or to search for items taken from the victim.

29. Unlike other suspects, Mr. Giroux was never asked to provide a cast of his teeth for comparison to the bitemarks. Indeed, with Michael Giroux's self-serving and false statement that he could not stand the sight of blood, the investigation of Michael Giroux seems to have been non-existent until 2019, when the Plaintiff's newer legal team (for the Motion for New Trial) itself undertook efforts to solve the crime.

30. Michael Giroux at all times relevant acted as an informant for, at a minimum, the Federal Bureau of Investigation, the Massachusetts State Police, and the Worcester Police Department.

31. The police interviewed the victim's neighbor, Gary Terhune, and his associates several times after finding inconsistencies in the accounts of his activities during the night of the murder. They never followed-up on these inconsistencies.

32. The Plaintiff, Gary Cifizzari, did not become a suspect until the police encouraged and coerced his brother, Michael Cifizzari, who suffered from chronic schizophrenia and acute psychosis, to make false statements implicating the Plaintiff in the crime.

33. Mr. Cifizzari's older brother, Michael, was diagnosed with schizophrenia in 1970 when he was seventeen years old. He also had a "borderline" intellectual disability, having scored 75 on an IQ test. In his youth, Michael Cifizzari, was committed to psychiatric institutions a myriad of

times.   The Milford Police and other law enforcement entities involved were cognizant of his

mental condition.  They were also aware that he was related to the victim, Ms. Schiappa.

34. On or about November 21, 1980, Michael Cifizzari was reported to the Milford Police for

drinking from a dog bowl on a stranger's porch. Seemingly unprovoked and without any factual

predicate or basis, Milford police officer Vincent Liberto and Sergeant Donald Small decided to

use this occasion to question and interrogate Michael about the murder while taking him to a

psychiatric unit at the Whitinsville Hospital in Milford.

35. During this interrogation, Michael initially said that he saw his "Aunt Connie" a couple of

weeks earlier despite the fact that Ms. Schiappa had died more than a year prior. The Milford

officers then asked Michael "how come" he had a fight with her and "why" he had hit her, to

which Michael responded that "she got me mad." When the Milford Police further asked if

Michael "killed his aunt" or "hit her with a stick," Michael clarified that he did not hit his aunt

and that she was alive and gave him money. When Officer Liberto asked why Michael initially

said that he hit his aunt, Michael responded: "That is what you want me to say. That's what you

want to hear, isn't it?"    Officer Liberto characterized Michael as incoherent during this

conversation and testified during the Plaintiff's court case that he thought Michael would agree

to anything asked of him.

36. On or about February 26, 1981, Michael Cifizzari walked into the Milford police station

asking to be allowed to spend the night there. He was homeless, dirty, cold, and hungry. Officer

Anthony DiGirolamo, the station desk officer and Michael's youth football coach, had allowed

him to sleep at the station about five or six times in the previous six months. Officer DiGirolamo

would later testify that "[e]ach time [Michael Cifizzari] came to the station previously, it seemed

as though he had something on his mind that he wanted to talk about." On this occasion, Milford

8

police officers DiGirolamo and his colleague, Officer John Chianese, decided to "have a little talk" with Michael about the murder of Ms. Schiappa. Michael was allegedly read his *Miranda* rights but initially signed a waiver of rights using the name "Paul M. Cartney[1]" before signing his real name. Over the next two hours, Officer Chianese wrote down four different statements, of varying degree of detail, that Michael purportedly gave, supposedly confessing to the murder of Ms. Schiappa.

37. The interrogation was not recorded, and Michael Cifizzari did not sign or otherwise adopt the statements.

38. According to the final (fourth) version of the statement drafted by Officer Chianese, after a night of drinking, smoking marijuana, and taking PCP, Michael Cifizzari and his cousin, Robert (Bob) Cananzey, went to Ms. Schiappa's house to ask for money because she had previously given them money. When she refused, the two "knocked her down" and attacked her with a stick. According to the statement, "Bobbie was biting her on the neck" and Michael "accidentally bit her on the neck and the inside of her upper leg." The statement says that Michael and Mr. Cananzey "were all drugged out" and does not account for their movements after leaving the victim's apartment.

39. However, and of immense salience, none of the versions of Michael's purported confession provided to Milford officers DiGirolamo and Chianese even so much as mentioned his brother, the Plaintiff Gary Cifizzari.

40. Later that morning, Michael Cifizzari was transported to the Worcester CPAC office, where he was further questioned by State Police Sergeant Joseph Doheny. Michael appeared "somewhat confused" and "wild-eyed," "looked like he had been up all night," and was at times "rambling." Sergeant Doheny reported that Michael stated that he "bit [the victim's] breast and

---

[1] Presumably, this was a bizarre reference to the singer and bassist for the Beatles, Paul McCartney.

Case 4:22-cv-40139-MRG   Document 1   Filed 11/29/22   Page 10 of 25

neck. I bit her nipple almost off. I bit her neck and left marks there. I bit her leg and her stomach."

41. Along with Milford Police Sgt. DiGirolamo, Milford Officers Chianese and Nicholas Sullo, Sergeant Doheny began questioning Michael about his statements and asked Michael whether he was sure he had been with his cousin, and not his brother, Gary, at the time of the crime.

42. Hitherto, however, there was no factual basis or predicate whatsoever in the investigation for the police to have suspected the Plaintiff, Gary Cifizzari.

43. Michael then responded that yes, "Gary was there," and said that "they [his cousin and his brother] were both there." Id. However, Michael never once indicated any purported act Gary Cifizzari was supposed to have taken during this incident. In fact, Michael later testified that when he spoke to Sergeant Doheny, he was actually trying to clarify that the Plaintiff, Gary Cifizzari, had nothing to do with the murder and that, at the time of the crime, he was with his brother Gary elsewhere.

44. Based on his observations of Michael as "wild-eyed" and "rambling," Sergeant Doheny was well aware that, at the time of his questioning, Michael had severe psychiatric problems, as were the Milford officers.

45. Michael's multiple statements were not only inconsistent with each other but also inconsistent with several of the known facts about the crime. Nonetheless, Michael was charged with the murder of Ms. Schiappa the same day as his alleged "confessions."

46. On February 26, 1981, the day Michael Cifizzari gave his statements, police separately interviewed Gary Cifizzari and Bob Cananzey.

47. Gary Cifizzari also maintained his innocence then, and forever thereafter. When questioned

about his brother's statements, Gary Cifizzari told police that he was nowhere near Milford on the night of the murder and that he only recalled going there in October 1979, after he and Michael were thrown out of their mother's house and sought to spend the night at their aunt Emma and cousin Antonetta Pasqualone's home in Milford.

48. Police took no further steps to investigate Ms. Schiappa's murder until more than two years after Michael Cifizzari was charged. In October 1982, shortly after Michael was found to be competent to stand trial[2], the Commonwealth obtained a court order for his dental impressions and sent them to Dr. Stanley Schwartz for comparison to photographs of the bitemarks. In February 1983, Dr. Schwartz excluded Michael as the person who purportedly bit Ms. Schiappa. In his report, Dr. Schwartz noted that Dr. Richard Souviron had also reviewed the materials and agreed that Michael could be excluded as the source of the bitemarks.

49. On or about April 27, 1983, Gary Cifizzari had tooth impressions taken by Dr. Juliano. Because Mr. Cifizzari had lost a front tooth in a beating in 1980, police also obtained a set of 1977 X-rays of Mr. Cifizzari's dentition and delivered them to Dr. Schwartz. Dr. Schwartz concluded "within reasonable medical certainty" that this final suspect's dentition matched the marks on the victim's body based on the position of the missing maxillary right central incisor. Mr. Cifizzari was interviewed again in May 1983, after the supposed "match" was determined. He again adamantly denied any involvement in the murder.

50. The case for guilt against Mr. Cifizzari consisted entirely of this "bitemark comparison evidence" in the form of expert testimony, which is now recognized as scientifically unreliable. The Commonwealth heavily relied on this throughout the criminal trial.

51. As a result of the expert testimony and despite the absence of any other credible evidence linking him to the crime, the Plaintiff, Gary Cifizzari, was convicted of first-degree murder on

---

[2] He had originally been found by the court to have been incompetent.

July 30, 1984.  The following day, July 31, 1984, he was sentenced to life in prison without the possibility of parole.

52. In the (final) Motion for New Trial proceedings, results of recent DNA tests conclusively excluded the Plaintiff, Gary Cifizzari, as a possible contributor of the DNA profile developed from the sperm and saliva deposited on the victim's nightgown at the time of her death.

53.  On or about May 3, 2019, the Massachusetts State Police Laboratory notified the police that the profile from a sperm fraction on Ms. Schiappa's nightgown matched the DNA profile of Michael Giroux, the original (and eminently obvious) suspect in the 1979 murder investigation, as outlined above.

54. There was, and remains, no evidence that Mr. Giroux ever had any connection to Gary or Michael Cifizzari.  Michael Cifizzari testified that he did not know Michael Giroux. At Michael Cifizzari's trial, Sergeant Thomas White also testified that Mr. Giroux did not have any dealings with Michael Cifizzari and did not "hang out in the same circle of friends."  In addition, nothing in the autopsy report or investigation reports indicates that more than one person was suspected of assaulting and killing Ms. Schiappa.

55. Having escaped justice in this case, Mr. Giroux pursued a life of violent crime. For example, he was one of three conspirators in the murder of a Rhode Island landlord who was shot as he collected rents.

56. In support of the Plaintiff's Motion for New Trial that would exonerate him, the Commonwealth's own forensic dentistry expert at trial, Richard Souviron, D.D.S., ABFO, in a sworn affidavit, stated, *inter alia*, "At trial, I identified Mr. [Gary] Cifizzari as the person who bit the victim, and I did not in any way qualify that statement. I would not offer such testimony today. I therefore recant the testimony that Mr. Cifizzari's teeth were the teeth, to a reasonable

12

degree of certainty, that inflicted both of the victim's bite wounds... There is no degree of certainty with which I could testify that Mr. Cifizzari was 'the biter' in this case," he averred, due to changes in the relevant scientific knowledge.

57. As referenced herein, the bitemark evidence was, in sum and substance, the entire case the Commonwealth had offered at trial against the Plaintiff.

58. Eventually, the Commonwealth via the Worcester County District Attorneys office, assented to the most recent and final Motion for New Trial filed by the Plaintiff in the criminal case in 2019. It thereafter entered a nolle prosequi, stating as follows:

> "[T]he aforementioned evidence leads the Commonwealth to determine that Michael Giroux perpetrated this brutal murder, and a Nolle Prosequi of Gary Cifizzari is in the interests of justice in this case."

59. This admission came, however, some 35 years too late.

60. At all times relevant, and from his arrest to the assent, the Plaintiff, Gary Cifizzari, was incarcerated in Massachusetts State Prisons, suffering daily, hourly, by the minute, and by each agonizing second, for every one of those 35 years.

## DAMAGES

61. The actions of the Defendants set forth herein unlawfully deprived Plaintiff of his civil rights under the United States Constitution and the laws of the Commonwealth of Massachusetts.

62. In serving some three-and-a-half decades behind bars, Plaintiff was wrongfully deprived of virtually his entire adult life up until the time of his release. Plaintiff must now attempt to make a life for himself outside of prison without the benefit of the decades of life experiences which ordinarily equip adults for that task.

63. Although Plaintiff has been out of prison since 2019, he has not maintained gainful employment, largely due to the stigma associated with his vacated murder conviction, and also substantial medical conditions from which he suffers greatly (see below).

64. Having been incarcerated for most of his adult life, Plaintiff does not have the benefit of education, training, or the professional experience necessary to equip him for the task of finding long-term employment.

65. Moreover, Plaintiff suffers from a myriad of substantial, debilitating conditions such as cancer and diabetes. Additionally, the emotional pain and suffering caused by losing 35 years in the prime of life is extreme and incessantly agonizing. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, weddings, graduations, and other life events with loved ones, the opportunity to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

66. Plaintiff has suffered severe and extreme injury, including, but not limited to, extraordinary physical suffering and extreme emotional distress, all proximately caused by Defendants' misconduct.

## 42 U.S.C. § 1983 CLAIMS

### COUNT I

**42 U.S.C. § 1983 Claim by Plaintiff for Unduly Suggestive, Biased, and Otherwise Improper Identification Procedures in Violation of the Fourteenth Amendment Against those Defendants then employed by the Milford Police Department as well as John Does 1-20**

67. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

68. "A defendant has a due process right to identification procedures meeting a certain basic standard of fairness." Commonwealth v. Dougan, 377 Mass. 303 (Mass. 1979).

69. "Criminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law. Gregory v. City of Louisville, 444 F.2d 725, 746 (6th Cir. 2006) (quoting Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967 (1967)).

70. Defendants Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of law facilitated identifications using unduly suggestive identification procedures, which led to the improper identification of Plaintiff as the individual who killed the victim. These improper procedures included:

- Questioning and interrogating Michael Cifizzari- a man who the police knew full well, or reasonably should have known, suffered from severe mental illness- without any factual predicate whatsoever about his supposed involvement in the murder.

- During said questioning and interrogation, without any factual predicate whatsoever, asking Michael Cifizzari suggestively whether he was sure he had been with his cousin, and not his brother, the Plaintiff Gary Cifizzari, at the time of the crime.

- Especially due to Michael Cifizzari's extremely deteriorated mental state, the police's used this technique- one grossly unnecessarily suggestive and conducive to irreparable mistaken identification- to falsely accuse, then ultimately convict, the Plaintiff of a murder he had absolutely nothing to do with.

71.  The Individual Defendants committed these unduly suggestive, biased and otherwise improper acts intentionally and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer would have believed these procedures were lawful or would produce a reliable identification of the Plaintiff as the killer.

72.  As a direct and proximate result of these unduly suggestive procedures, Michael Cifizzari falsely identified Plaintiff as having been guilty of murder, in violation of Plaintiff's Fourteenth Amendment right to a fair trial and to be not deprived of liberty without due process of law. Due to these Defendants' misconduct, Plaintiff suffered 35 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

### COUNT II- 42 U.S.C. § 1983

**42 U.S.C. § 1983 Claim by Plaintiff for Improper Interrogation Procedures and Techniques in Violation of the Fourteenth Amendment Against those Defendants then employed by the Milford Police Department as well as John Does 1-20**

73. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

74.  The actions by those Defendants then employed by the Milford Police Department as well as John Does 1-20 in interrogating and questioning the severely mentally ill Michael Cifizzari, then later implicating the Plaintiff in the murder in additional interrogations, as set forth above, are so

offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.   They were so brutal and offensive as to shock the conscience.  *See e.g.,* <u>Miller v. Fenton</u>, 474 U.S. 104, 109 (1985).

75. The Individual Defendants committed these unduly suggestive, biased and otherwise improper acts intentionally and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer would have believed these procedures were lawful or would produce a reliable identification of the Plaintiff as the killer.

76. As a direct and proximate result of these shocking and offensive interrogation procedures, Michael Cifizzari falsely identified Plaintiff as having been guilty of murder, in violation of Plaintiff's Fourteenth Amendment right to a fair trial and to be not deprived of liberty without due process of law.

77. Due to these Defendants' misconduct, Plaintiff suffered 35 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

### COUNT III- 42 U.S.C. § 1983

### 42 U.S.C. § 1983 Claim by Plaintiff for Fabricating False Inculpatory Evidence in Violation of the Fourteenth Amendment Against those Defendants then employed by the Milford Police Department as well as John Does 1-20

78. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

79. Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of state law fabricated inculpatory evidence via their use, without any factual predicate, of the interrogation and questioning of the Plaintiff's severely mentally ill brother.

80. As a direct and proximate result of this fabrication of inculpatory evidence the Plaintiff's clearly established Fourteenth Amendment due process rights, including the right to a fair trial and his Fourth Amendment right to be free from unreasonable seizures were violated, and Gary Cifizzari was wrongly convicted and suffered the injuries and damages described above.

<h3 align="center">COUNT IV- 42 U.S.C. § 1983</h3>

**42 U.S.C. § 1983 Claim by Plaintiff for Fabricating False Inculpatory Evidence in Violation of the Fourteenth Amendment Against Defendant Richard Souviron**

81. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

82. Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of state law fabricated inculpatory evidence via their use, without any factual predicate, of the interrogation and questioning of the Plaintiff's severely mentally ill brother.

83. As a direct and proximate result of this fabrication of inculpatory evidence the Plaintiff's clearly established Fourteenth Amendment due process rights, including the right to a fair trial and his Fourth Amendment right to be free from unreasonable seizures were violated, and Gary Cifizzari was wrongly convicted and suffered the injuries and damages described above.

18

## COUNT V- 42 U.S.C. § 1983

**42 U.S.C. § 1983 Claim by Plaintiff for Failure to Investigate Against those Defendants then employed by the Milford Police Department as well as John Does 1-20**

84. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

85. Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of state law deliberately and/or recklessly failed to investigate adequately, as any minimally competent officer or forensic scientist would have, by, among other things, failing to adequately investigate the man who was ultimately established via DNA evidence as the murderer, Michael Giroux and his connection with said murder.

86. As a direct and proximate result of this deliberately and/or recklessly conducted failure, the Plaintiff's clearly established Fourteenth Amendment due process rights, including the right to a fair trial and his Fourth Amendment right to be free from unreasonable seizures were violated, and Gary Cifizzari was wrongly convicted and suffered the injuries and damages described above.

## COUNT VI- 42 U.S.C. § 1983

**42 U.S.C. § 1983 Claim by Plaintiff for Malicious Prosecution Against those Defendants then employed by the Milford Police Department as well as John Does 1-20**

87. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

88. Those Defendants then employed by the Milford Police Department as well as John Does 1-20, state actors acting under color of law, commenced or caused to be commenced a criminal prosecution, instituted with malice and without probable cause against the Plaintiff. As set forth above, they together constructed a case against the Plaintiff, Gary Cifizzari, by suppressing,

fabricating, and/or failing to investigate important evidence, and, ultimately, obtained a conviction against him.

89. The criminal actions ultimately terminated in the Plaintiff's favor on December 10, 2019, when his convictions were vacated by the trial court on the grounds of his actual innocence, due to conclusive scientific evidence that the perpetrator's DNA did not match him but instead matched Mr. Giroux. The Commonwealth thereafter filed a nolle prosequi indicating that the reason for it was because DNA evidence showed Giroux had committed the murder.

90. The conduct of Defendants then employed by the Milford Police Department as well as John Does 1-20 violated the Plaintiff's clearly established rights under the Fourth Amendment and the procedural due process component of the Fourteenth Amendment.

91. As a proximate result of the above-referenced conduct, the Plaintiff was arrested, was prosecuted, was forced to endure an unfair trial and wrongful conviction, and was wrongly imprisoned for some 35 years. He suffered and continues to suffer the highly-substantial injuries and damages set forth above.

## COUNT VII- 42 U.S.C. § 1983

### Monell Claim Against The Town of Milford and The Milford Police Department

92. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

93. At all times relevant, including during the investigation of the murder, the defendants The Town of Milford and The Milford Police Department had a policy, custom, or practice of failing to properly discipline, supervise and train Milford police officers including the individuals named in this case. The Town of Milford and The Milford Police Department failed to ensure that its police officers would conduct constitutionally adequate identification procedures; obtain

probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants; follow the duties imposed by *Brady v. Maryland*; conduct adequate investigations, and never fabricate inculpatory evidence.

94. These policies, customs and practices led Milford police officers to believe that misconduct would be tolerated and that allegations of abuse of constitutional rights would not be investigated. They made it foreseeable that officers would violate people's constitutional rights.

95. The policies, customs and practices of the Town of Milford and the Milford Police Department described in this complaint were the moving force behind the plaintiff's arrest, prosecution, conviction and incarceration.

## Count VIII-- 42 U.S.C. § 1983

### Claims Against Doe Defendants for Supervisory Liability as to those Defendants then employed by the Milford Police Department as well as John Does 1-20

96. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

97. The Doe Defendants who served as supervisors in the Milford Police Department, acting under color of law with deliberate indifference to the rights of criminal suspects, failed to train and supervise adequately the relevant Milford police officers. In doing so, the Milford supervising Doe Defendants tacitly acquiesced in, condoned, or encouraged their officers to engage in unconstitutional misconduct, including the erroneous identification of the Plaintiff as the killer, the suppression of exculpatory evidence, and other conduct set forth above.

98. The failure of these defendants to supervise and train those officers amounted to deliberate indifference, or intentional misconduct, which proximately and directly caused the Plaintiff to suffer all of the injuries and damages set forth above.

21

**Count IX - 42 U.S.C. § 1983**

**Conspiracy Claims Against to those Defendants then employed by the Milford Police Department as well as John Does 1-20**

99. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

100. Those Defendants then employed by the Milford Police Department as well as John Does 1-20 acted in concert to deprive the Plaintiff of his constitutional due process rights by, among other things, suppressing, fabricating, failing to disclose, and/or failing to properly investigate the murder.

101. On information and belief, Defendants affirmatively agreed to act together in, among other things, the wrongful identification of the Plaintiff, in failing to investigate other exculpatory leads and in suppressing evidence helpful to the Plaintiff.  By doing so, defendants agreed to deprive Plaintiff of his clearly established rights under the Fourth Amendment and the procedural due process component of the Fourteenth Amendment.

102. On information and belief, in furtherance of the conspiracy, Defendants undertook overt acts as referenced above and herein.

103. Defendants' conspiracy directly caused the constitutional deprivations suffered by the Plaintiff's false arrest, malicious prosecution, unfair trial, wrongful conviction and unlawful confinement, and all the other grievous permanent damages set forth above and herein.

**COUNT X-- State Civil Rights Statute**

**Claims Against those Defendants then Employed by the Milford Police Department as well
as John Does 1-20 For Violation Of Massachusetts Civil Rights Act, M.G.L. CH. 12, § 111**

104. Plaintiff hereby incorporates all of the foregoing as if set forth herein and further

alleges as follows:

105. All Defendants interfered with the Plaintiff's exercise and enjoyment of rights guaranteed to

him by the United States Constitution, and the Constitution and Laws of the Commonwealth of

Massachusetts by, among other things, conducting a sham investigation of the actual perpetrator,

Giroux, coaching, coercing or otherwise fabricating evidence against the Plaintiff, or causing

witnesses to give statements and/or testimony that would result in his misidentification, or

offering statements and/or testimony they knew or should have known was false.

106. Defendants' misconduct deprived plaintiff of his rights under federal and state law by

threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

107. As a direct and proximate result of this conduct, plaintiff suffered the injuries as described

above.

**CLAIMS FOR DAMAGES**

108. Defendants' actions deprived Gary Cifizzari of his civil rights under the First, Fourth, Fifth,

Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and the

Constitution and laws of the Commonwealth of Massachusetts.

109. The defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless,

bad-faith and/or malicious acts, misdeeds and omissions caused Cifizzari to be falsely arrested,

23

maliciously prosecuted, unfairly tried, wrongfully convicted, and to suffer 35 years of wrongful imprisonment.

110. All the alleged acts, misdeeds and omissions committed by the defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of defendants meets all of the standards for imposition of punitive damages.

WHEREFORE, Plaintiff, Gary Cifizzari, prays as follows:

A. That the Court enter judgment in favor of the Plaintiff, Gary Cifizzari, and against defendants on all Counts of the Complaint;

B. That the Court award compensatory damages to Plaintiff and against the defendants, jointly and severally, in an amount to be determined at trial;

C. That the Court award punitive damages to Plaintiff and against all individual defendants, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar proscribed conduct by defendants in the future;

D. That the Court award to Plaintiff and against defendants pre-judgment and post judgment interest on all sums awarded him in this action and that it further award to Plaintiff recovery of all of his costs and expenses concerning this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and/or other authority; and

E. That the Court grant Plaintiff any such other relief to which he may be entitled.

## JURY TRIAL DEMAND

***PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES
AND CLAIMS SO TRIABLE.***

RESPECTFULLY SUBMITTED,
THE PLAINTIFF,
GARY CIFIZZARI,
By His Attorney,

William S. Smith, Esq.
THE LAW OFFICE OF WILLIAM S. SMITH
206 Worcester Road, P.O. Box 585
Princeton, MA 01541
(774) 317-9287
holdenattorney@gmail.com
BBO# 635432  Dated:  November 10, 2022

25