## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **GARY CIFIZZARI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 4:22-cv-40139-MRG** |
| | ) | |
| **TOWN OF MILFORD, FORMER** | ) | |
| **MILFORD POLICE OFFICERS** | ) | |
| **VINCENT LIBERTO, JOHN** | ) | |
| **CHIANESE, FORMER MILFORD** | ) | |
| **POLICE SGT.S ANTHONY** | ) | |
| **DIGIROLAMO AND DONALD** | ) | |
| **SMALL, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 117]

**GUZMAN, J.**

  Plaintiff Gary Cifizzari brings this suit against the Town of Milford and several former Milford Police Department ("MPD") officers alleging violations of his civil rights stemming from his 1984 wrongful conviction for the murder of Concetta Schiappa.   Before the Court is Defendants' Motion for Summary Judgment, ECF No. 117. For the reasons stated below, the motion is **GRANTED** as to all counts.

## I.  BACKGROUND[1]

  The events giving rise to this case began on September 29, 1979, but as is often true in matters involving wrongful convictions, the tragedy did not end there. Instead, these events

---

[1] The facts are drawn from Plaintiff's Amended Complaint [ECF No. 65], Plaintiff's Response to Defendants' Joint Local Rule 56.1 Concise Statement of Undisputed Material Facts [ECF No. 122], Response of Milford Defendants to Plaintiff's Local Rule 56.1 Statement of Material Facts [ECF No. 131], and the documents cited therein.

culminated in an innocent man spending nearly thirty-five years in prison for a murder he did not commit. In seeking to address this profound injustice, the Court must now sift through a tangled web of facts dating back four decades.

Although the parties agree that certain basic events took place, they dispute many facts and the inferences that should be drawn from the evidence before the Court. Because Defendants have moved for summary judgment, the Court must review the evidence in the light most favorable to Plaintiff, who opposes summary judgment, and make all reasonable inferences in his favor. See Fed. R. Civ. P. 56(a); SEC v. Sharp, 692 F. Supp. 3d 9, 10 (D. Mass. 2023). However, the Court's analysis is limited to considering only those facts which are admissible and relevant to the legal issues at hand. Moreover, as this matter appears on summary judgment, the Court must distinguish which facts are truly material and consider whether – in the face of undisputed *material* facts – legal standards constrain Plaintiff's claims such that the Defendant is entitled to judgment as a matter of law. See Triumph Foods, LLC v. Campbell, 742 F. Supp. 3d 63, 69 (D. Mass. 2024) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

### A. The Murder

Between September 28 and 29, 1979,[2] Milford, Massachusetts resident, Concetta Schiappa, was murdered in her apartment. [ECF No. 122 ¶ 1]. Her body was discovered by her upstairs landlord on the morning of September 29, 1979, and the homicide was initially reported to the MPD. [ECF No. 117 at 7; ECF No. 122 ¶ 26]. The officers determined that the death had been a homicide. [ECF No. 122 ¶ 2]. A broomstick had been pushed inside the victim's body, and there were bitemarks on her body. [ECF No. 131 ¶¶ 2–3].

---

[2] The date of death is not established, as Mrs. Schiappa was last seen alive on September 28, 1979 and it is unknown if Mrs. Schiappa died before or after midnight on the 28th. [ECF No. 122 ¶ 1; Am. Compl. ¶ 18, ECF No. 65].

### B.  Control of the Murder Investigation

Although Mrs. Schiappa was murdered in Milford, pursuant to a state statute, the Worcester County District Attorney ("WCDA"), rather than the MPD, directed the investigation. [ECF No. 122 ¶ 5; Mass. Gen. Laws ch. 38, § 4[3]]. The Crime Prevention and Control ("CPAC") Unit is a unit of the State Police that works with the WCDA and handles murder investigations in the county, except in the City of Worcester. [ECF No. 122 ¶ 7]. While Plaintiff objects to the characterization of the WCDA and CPAC "coordina[ting], direct[ing], and control[ling]" the Schiappa murder investigation, he does not dispute that the WCDA was the agency that was overall responsible for conducting the investigation and that a CPAC Unit detective was the lead investigator. [Id. ¶¶ 4, 8, 10–11]. Additionally, the plain language of the statute stipulates that the WCDA "shall *direct and control* the investigation" of a death falling under its purview. Mass. Gen. Laws ch. 38, § 4 (emphasis added). Further, the decision to indict and prosecute Plaintiff rested squarely with the WCDA, with the investigation led at the time by Assistant District Attorney ("ADA") Lawrence Murphy. [ECF No. 122 ¶ 19]. Therefore, the Court concludes that the WCDA and CPAC directed and controlled the murder investigation and Plaintiff's subsequent prosecution.

The extent to which certain Defendant MPD officers participated in the murder investigation is somewhat disputed, although the dispute centers more on the characterization of their coordination with WCDA and CPAC rather than on a dispute that WCDA and CPAC were largely in charge. [See id. ¶¶ 59–66]. It was standard protocol during CPAC investigations to

---

[3] Mass. Gen. Laws ch. 38, § 4 provides that in the event of a death "due to violence or other unnatural means or to natural causes that require further investigation," "the district attorney or his law enforcement representative shall *direct and control* the investigation of the death and shall coordinate the investigation with the office of the chief medical examiner and the police department within whose jurisdiction the death occurred." (emphasis added).

request local law enforcement to accompany CPAC investigators on interviews, particularly when witnesses resided in that locality. [Id. ¶ 61].

The six individual defendants in this case worked for the MPD, and each had varying levels of involvement in the investigation of Mrs. Schiappa's homicide. A brief summary of the role of each defendant, as well as key non-defendant members of the investigation into Mrs. Schiappa's murder, follows:

- <u>Vincent Liberto</u>: Defendant Liberto was an MPD detective. [Id. ¶ 56]. He responded to the murder scene along with several other members of the Milford Police. [Id.] Det. Liberto also accompanied CPAC investigators on a few witness interviews. [Id. ¶¶ 74, 78, 82, 84]. In November 1980, Det. Liberto and Sgt. Small transported Plaintiff's brother and co-defendant, Michael Cifizzari, to a psychiatric hospital for involuntary commitment, and conversed with Michael during the ride about the victim, Mrs. Schiappa, who was the Cifizzari brothers' great-aunt. [Id. ¶¶ 95–98]. After Plaintiff's trial and conviction, Det. Liberto served as the Chief of the MPD. [ECF No. 131 ¶ 174].

- <u>John Chianese</u>: Defendant Chianese was a patrol officer with the MPD. [ECF No. 122 ¶ 58]. Officer Chianese grew up in Milford and knew Michael Cifizzari as being "about two grades behind [him] in school." [ECF No. 131 ¶ 49]. Officer Chianese was present at an interrogation[4] with Michael Cifizzari, at the Milford Police Station on February 26, 1981. [ECF No. 122 ¶ 58]. Officer Chianese wrote down Michael Cifizzari's statements during the interrogation. [Id. ¶¶ 58, 115].   Following that interrogation, together with Sgt.

---

[4] Defendants refer to Michael Cifizzari's interaction at the MPD Station as an "interview," whereas Plaintiff refers to it as an "interrogation." [See, e.g., ECF No. 122 ¶ 113]. Judge Francis Keating who ruled on Michael Cifizzari's Motion to Suppress determined that the conversation was a "custodial" "interrogation." [See Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983), ECF No. 118-2 at 192]. Accordingly, the Court will refer to the conversation as an interrogation.

DiGirolamo and Officer Sullo, Officer Chianese transported Michael Cifizzari from the Milford Police Station to the State Police CPAC office in Worcester. [Id. ¶ 58]. Officer Chianese was never officially assigned to investigate the Schiappa murder. [ECF No. 131 ¶ 42].

- Anthony DiGirolamo: Defendant DiGirolamo was an MPD sergeant. [ECF No. 122 ¶ 55]. Although Sgt. DiGirolamo was never officially assigned to investigate the Schiappa murder, [ECF No. 131 ¶ 42], he conducted the interrogation of Michael Cifizzari at the Milford Police Station on February 26, 1981, [ECF No. 122 ¶ 55]. Sgt. DiGirolamo knew Michael since he was about twelve years old and had been his football coach when Michael was a child. [ECF No. 131 ¶ 51]. Together with Officers Chianese and Nicholas Sullo, Sgt. DiGirolamo transported Michael Cifizzari from the Milford Police Station to the State Police CPAC Office in Worcester after Michael's interrogation. [ECF No. 122 ¶ 55]. Sgt. DiGirolamo is deceased. [Id.]

- Donald Small: Defendant Small was a MPD detective sergeant. [Id. ¶ 57]. Det. Sgt. Small attended witness interviews with State Police officers. [Id. ¶¶ 57, 76, 77, 79, 80, 81, 83, 85, 86]. Det. Sgt. Small accompanied Det. Liberto in transporting Michael Cifizzari to the psychiatric hospital in November 1980. [Id. ¶ 90].  Det. Sgt. Small is deceased. [Id. ¶ 57].

- Joseph Doheny: Doheny, not a named defendant, was a Sergeant of the State Police CPAC Unit in Worcester and the lead detective on this case. [Id. ¶¶ 11, 14, 18, 48; Murphy Dep., ECF No. 118-2 at 365:10–11; Michael Cifizzari Trial Tr. 244:2–4, ECF No. 118-2 at 244:2–4]. Sgt. Doheny conducted the State Police interrogation of Michael Cifizzari on February 29, 1981 at the CPAC Office in Worcester. [ECF No. 122 ¶¶ 134-44]. It was

during this interrogation that Michael Cifizzari implicated Plaintiff Gary Cifizzari in the murder of Mrs. Schiappa. [Id. ¶ 130]. Sgt. Doheny is deceased. [Id. ¶ 48].

- Robert Meier: Trooper Meier, not a named defendant, was a State Police CPAC investigator on the case, and was the main detective handling the bitemark evidence and impressions. [Id. ¶ 12; Murphy Dep. at 364:20–23].

- Thomas White: Trooper White, not a named defendant, was a State Police CPAC investigator on the case. [ECF No. 122 ¶ 50]. Trooper White arrived at the Milford Police Station on the morning of February 26, 1981, to be briefed on and participate in Michael Cifizzari's interrogation. [Michael Cifizzari Trial Tr. at 225:20–226:2, ECF No. 124-2]. Trooper White also conducted some witness interviews. [ECF No. 122 ¶¶ 76–81].

### C. Initial Collection of Evidence

The homicide was initially reported to the MPD, who contacted the CPAC Unit to take over the investigation. [Id. ¶¶ 26, 28–30]. The State Police and the State Crime Lab collected physical evidence, and the State Crime Lab was responsible for analyzing it. [Id. ¶¶ 34-37]. It is undisputed that the MPD did not possess or control physical evidence in the murder investigation. [Id. ¶ 67]. An autopsy on the victim was performed on September 29, 1979 by Dr. Ambrose Keeley. [Id. ¶ 40]. Prior to conducting the autopsy, Dr. Keeley contacted Dr. Arthur Schwartz, a Forensic Dentist of the Tufts School of Dentistry, and the State Police asked Dr. Schwartz to attend the autopsy. [Id. ¶¶ 42–43]. Dr. Schwartz examined the bitemarks on the body of the victim, and then made a cast of the bitemarks located on the victim's stomach. [Id. ¶ 44]. Trooper Meier was the main detective handling the bitemark evidence and impressions. [Id. ¶ 12]. To Trooper Meier's knowledge, MPD officers had no role in the decision to have Dr. Schwartz attend the autopsy,

examine the bitemarks on the victim, or make a cast of the bitemark from the victim's stomach. [Id. ¶ 47].

In the weeks following the discovery of Mrs. Schiappa's murder, CPAC investigators accompanied by local MPD officers conducted interviews with neighbors and witnesses. [Id. ¶ 68]. Not all the facts relating to witness interviews are relevant to summary judgment, and many of the factual assertions are supported only by hearsay in the form of police reports and witness statements within them. The police reports are documents that, if introduced for the truth of the matter asserted, fit the definition of hearsay. See Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."). However, the police reports fall within the business record exception to hearsay, Fed. R. Evid. 803(6), and would be admissible at trial. The same cannot be said for witness statements recorded in police reports. "Although the police officer who writes the report is acting in the regular course of business, the witness talking to the officer is not," and the witness's statements are not covered by the business record exception. United States v. Matta-Quiñones, Nos. 23-1132, 23-1134, 2025 U.S. App. LEXIS 14107, at *54 (1st Cir. June 9, 2025) (citing United States v. Vigneau, 187 F.3d 70, 75–76 (1st Cir. 1999)).

Relevant, but not material to summary judgment, is that Michael Giroux, the true killer of Mrs. Schiappa (as established by DNA evidence in 2019), was the investigation's murder suspect before Michael Cifizzari made his statement to Sgt. DiGirolamo in Milford in February 1981. [ECF No. 122 ¶¶ 93–94]. Michael Giroux was the brother-in-law of Mrs. Schiappa's neighbor, Kathy Duncan. [Id. ¶ 81]. Duncan reported that Giroux had visited the year before the murder and Mrs. Schiappa had accused him of seeing him leave her apartment before she discovered missing money. [Id.] Duncan stated that Giroux was living in Milford after recently returning from the U.S.

7

Army. [Id.] CPAC investigators interviewed Michael Giroux at least twice in the weeks after the murder. [Meier Aff. ¶¶ 21–30 (Def. Ex. 3, ECF No. 118-2 at 174–87)].

Throughout the current litigation, Plaintiff argues investigators failed to pursue various leads that would have led them to charging Michael Giroux with Mrs. Schiappa's murder. Plaintiff alleges that David Giroux, Michael Giroux's brother, stated to Det. Liberto and another officer that, on the night of Mrs. Schiappa's murder, Michael came to his house with blood on his clothes. [ECF No. 131 ¶ 26]. This assertion arises from David Giroux's 2024 deposition. [David Giroux 2024 Dep. (Def. Ex. 29, ECF No. 118-3 at 264–308)]. In his deposition, David Giroux states that two officers spoke with him a few days after the murder in 1979 to ask him some questions about his brother Michael. [Id. at 7:23–9:3]. While David Giroux initially speculated that the officer he spoke with might have been Det. Liberto, he also stated he knew Liberto as an officer generally because, "Just, you know, you know who the cops are in Milford[.]" [Id. at 22:1–10]. David Giroux could not remember if the officers worked for the MPD or the State Police, or a combination of the two. [Id. at 24:3–11]. There is no documentary evidence that any State Police investigator, individually or accompanied by an MPD officer, ever interviewed David Giroux any time after the murder. [ECF No. 131 ¶ 26].  Likewise, there is no documentary evidence that MPD officers ever interviewed or attended an interview with David Giroux. [Id.] Further, in an affidavit made for Plaintiff's 2019 motion for new trial, David Giroux asserted that he was "not certain if the police talked to [him] about the murder in 1979." [David Giroux Aff. (Def. Ex. 30, ECF No. 118-3 at 310–13)]. In his own motion for new trial, Plaintiff stated, "[t]here is no evidence that the police interviewed anyone else regarding Mr. Giroux's whereabouts on the night of the murder, including his brother David." [Gary Cifizzari Mot. for New Trial at 14 (Def. Ex. 10, ECF No. 118-3 at 2–95)].

Plaintiff also notes that Gary Terhune, Mrs. Schiappa's neighbor, had described to police seeing a white man, twenty-five to thirty-five years old, between 5'9" and 5'11" with an "Afro-type" haircut in Mrs. Schiappa's apartment around the time of the murder, a description which more closely matched the appearance of Michael Giroux than Gary Cifizzari. [ECF No. 131 ¶¶ 160–63]. Plaintiff asserts that the MPD Defendants hid this information. However, the final State Police report of the murder investigation that summarizes witness interviews includes a reference to Terhune's statement. [1979 State Police Report ¶ 10 (Def. Ex. 1, dated October 11, 1979, ECF No. 118-2 at 1–21); ECF No. 122 ¶ 69; ECF No. 131 ¶ 160]. While there may not be a separate document recording Terhune's statement, as appears for some other witness statements, the State Police record indicates that the CPAC investigators were aware of Terhune's observations and his statement was included in the investigative record. Plaintiff also does not indicate which "police" allegedly spoke with Terhune; however, the State Police report indicates it was Det. Sgt. Small and Trooper White who interviewed Terhune. [1979 State Police Report ¶ 10].

Plaintiff also alleges that Michael Giroux was a police informant and that the Defendant MPD officers framed the Cifizzari brothers to protect Giroux. [ECF No. 127 at 19–20]. There is no documentary or admissible testimonial evidence supporting Plaintiff's assertion that Giroux was an informant for the MPD at any time. There is evidence that Giroux served as an informant for the FBI, the Massachusetts State Police, and the Worcester Police; however, the earliest evidence establishes his cooperation with law enforcement beginning in 1991. [ECF No. 122 ¶ 325; ECF No. 131 ¶ 31].

It is undisputed that the State Police "looked at" Giroux as a suspect but could not show he knew the Cifizzaris or place him at the scene. [ECF No. 122 ¶ 318]. Michael Giroux was never charged with the murder of Mrs. Schiappa. [Id.] Once Michael Cifizzari made his statements to

Sgt. DiGirolamo and Sgt. Doheny in February 1981, the Cifizzari brothers became the primary murder suspects. [Id. ¶¶ 93–94].

### D. Michael Cifizzari's Milford Police Department Interrogation

On February 26, 1981, at approximately 1:00am, Michael Cifizzari walked into the Milford Police Station, asking to spend the night there. [ECF No. 122 ¶ 99–100; 1979 State Police Report ¶ 1]. Present at the station were Sgt. DiGirolamo and Officer Chianese. [ECF No. 122 ¶ 103]. Sgt. DiGirolamo, Michael Cifizzari's former youth football coach, had previously allowed Michael Cifizzari to sleep at the station on multiple occasions. [Id. ¶ 101]. Michael Cifizzari had previously been diagnosed with schizophrenia and had stayed at a state treatment facility on several occasions. [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983) ¶ 12 (Def. Ex. 26, ECF No. 118-3 at 185–94)]. Michael Cifizzari struggled to maintain employment and spent significant periods of time without housing. [Gary Cifizzari Mot. for New Trial at 9]. The ruling on Michael Cifizzari's motion to suppress indicates that often, Michael appeared to be on drugs when he came into the station, "[h]owever, on this night, Sgt. DiGirolamo observed the defendant to be sober, eyes clear and speech clear. [Michael] did not appear to be on drugs." [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983) ¶ 2].

Around 1:00am or 1:30am, Sgt. DiGirolamo attempted to talk with Michael Cifizzari about Mrs. Schiappa's murder. [ECF No. 122 ¶ 107]. Mrs. Schiappa was Michael and Gary Cifizzari's great-aunt. [Id. ¶ 109]. Sgt. DiGirolamo read Michael Cifizzari his Miranda rights and Officer Chianese wrote out the Miranda rights on a card. [Id. ¶ 107–108; 1979 State Police Report ¶ 1]. On the Miranda form, Michael Cifizzari first signed his name as "Paul M. Cartney," after which Sgt. DiGirolamo instructed Michael to sign his own name, which he did. [ECF No. 131 ¶ 67].

The parties offer differing accounts of how the questioning unfolded. Defendants assert that Sgt. DiGirolamo asked Michael Cifizzari if he knew anything about the murder, to which he responded that he did, and then gave a narrative account during which he stated that he had gone to Mrs. Schiappa's house on the night she was murdered, attempted to get some money from her, was refused, became angry, and then killed her. [ECF No. 122 ¶ 109–10]. Michael Cifizzari also stated that his cousin Robert Cananzey was with him during the murder. [Id. ¶ 111]. Plaintiff contends that the interaction with Sgt. DiGirolamo was coerced interrogation where Sgt. DiGirolamo and Officer Chianese asked Michael Cifizzari leading questions and challenged him about facts related to the Schiappa murder and had him either agree or disagree. [ECF No. 131 ¶¶ 72–75].

Officer Chianese wrote down what Michael Cifizzari said during the interrogation. [Id. ¶ 80]. During the questioning, Sgt. DiGirolamo and Officer Chianese contacted Trooper White and requested that he come to the MPD station to participate and be briefed on Michael's statements. [ECF No. 122 ¶ 112]. Trooper White arrived and listened to the interrogation of Michael Cifizzari, but when he attempted to ask questions, Michael Cifizzari refused to answer him. [Id. ¶ 113]. Trooper White left the room and stood in the hallway, and Sgt. DiGirolamo questioned Michael for another half hour or less. [Id. ¶ 114].

Later, during his criminal prosecution, Michael Cifizzari moved to suppress his statements from this interrogation. After a two-day evidentiary hearing, Judge Francis Keating of the Massachusetts Superior Court denied the motion to suppress, holding Michael's statements were made voluntarily. [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983)]. Judge Keating noted that Sgt. DiGirolamo's "fatherly" relationship to Michael "facilitated the confession"; that Michael "was not tricked or cajoled into making a statement"; that although Michael had struggled

with mental illness, he had "apparent clarity on the night in question"; and that Michael was capable of understanding the meaning and effect of his confession. [Id. Rulings of Law ¶¶ 1–4]. Judge Keating's ruling was later affirmed by the Massachusetts Appeals Court. Com. v. Cifizzari, 474 N.E.2d 1174 (Mass. App. Ct. 1985).

### D. Michael Cifizzari's CPAC Interrogation

Around 7:15am the same morning as the interrogation at the MPD station, Sgt. DiGirolamo and Officers Chinese and Sullo transported Michael Cifizzari to the CPAC office in Worcester. [ECF No. 122 ¶¶ 119, 134]. Sgt. Doheny introduced himself, read Michael Cifizzari his Miranda rights, and questioned him about the murder. [Id. ¶¶ 134-37]. Michael Cifizzari again confessed to the murder, although the details differed slightly from his account at the Milford station. [Id. ¶¶ 137–43]. The State Police Report indicates that Michael stated graphic and specific details about what he and his cousin Robert Cananzey had done to Mrs. Schiappa. [Id. ¶ 142; May 7, 1981 State Police Report ¶ 4 (Def. Ex. 7, ECF No. 118-2 at 398–403)]. Sgt. Doheny then asked Michael Cifizzari if he was sure that it was his cousin Cananzey that was with him, and not his brother, Gary Cifizzari. [ECF No. 122 ¶ 143]. Michael Cifizzari replied, "Yes, Gary was there." [Id.]

On February 26, 1981, Michael Cifizzari was held without bail. [Id. ¶ 156]. On February 27, 1981, Michael Cifizzari was examined by a court psychiatrist during arraignment at Milford District Court and was declared incompetent to stand trial. [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983) ¶ 10]. Michael Cifizzari was then hospitalized until around October 1982, after which he was deemed competent to stand trial. [1984 Trooper Meier Report ¶¶ 1–2, (Def. Ex. 16, ECF No. 118-3 at 129–33)]. After his motion to suppress was denied in June 1983, in September of that same year, Michael Cifizzari was tried and convicted of second-degree murder.

[ECF No. 122 ¶ 157]. Michael Cifizzari appealed the conviction, and the conviction was affirmed by the Massachusetts Appeals Court. <u>Cifizzari</u>, 474 N.E.2d 1174.

### E.  Investigation of Gary Cifizzari

After Michael Cifizzari implicated his brother, Plaintiff Gary Cifizzari, Gary was located and Trooper Meier interviewed him. [ECF No. 122 ¶¶ 160–61]. Plaintiff denied being involved in the murder of Mrs. Schiappa. [<u>Id.</u> ¶ 160]. Trooper Meier also conducted the investigation into the bitemarks on the victim's body. [<u>Id.</u> ¶ 165]. MPD did not direct and was not involved in the decision or arrangements to make a cast of the victim's bitemarks. [<u>Id.</u> ¶ 182]. Plaintiff was not under arrest at the time of Trooper Meier's bitemark investigation, but consented to having his dental impression made to compare with the bitemark cast made of the victim. [<u>Id.</u> ¶ 166]. MPD was not involved in getting Gary Cifizzari's dental mold made. [<u>Id.</u> ¶ 213]. Trooper Meier and ADA Murphy travelled to Florida to recruit Dr. Richard Souviron to be an expert in the murder case on the dental evidence. [<u>Id.</u> ¶¶ 168–69]. Dr. Souviron's opinion was that Gary Cifizzari's teeth made the marks on Mrs. Schiappa's body. [<u>Id.</u> ¶ 170]. Dr. Arthur Schwartz, the expert who examined the bitemarks on Mrs. Schiappa's body during the autopsy, also formed the opinion that Gary Cifizzari's teeth matched the bitemarks on the victim's body. [<u>Id.</u> ¶ 168]. The dental evidence and concurring expert opinions were presented to the grand jury, which indicted Gary Cifizzari in November 1983 for the 1979 murder of Concetta Schiappa. [<u>Id.</u> ¶ 206]. Gary Cifizzari was arrested in November of 1983 for the murder of Mrs. Schiappa. [ECF No. 122 ¶ 174]. At the State Police CPAC office, Gary Cifizzari was questioned by Sgt. Doheny in Trooper Meier's presence, during which Cifizzari denied having anything to do with the murder. [Gary Cifizzari Statement (Def. Ex. 20, ECF No. 118-3 at 141); Meier Aff. ¶ 51].

### F.  Conviction of Gary Cifizzari and Post-Trial Proceedings

At Gary Cifizzari's trial in 1984, the Commonwealth relied on the testimony of three forensic dental experts, and each expert matched Gary Cifizzari's dental impression to the bitemarks left on the victim's body. [ECF No. 122 ¶ 222; see Com. v. Cifizzari, 492 N.E.2d 357, 361 (Mass. 1986) (hereinafter, "Gary Cifizzari 1986 SJC Appeal")]. The third dental expert witness, Dr. Anthony Captline, was hired by Gary Cifizzari's defense, but when presented with the expert opinions of Doctors Schwartz and Souviron, agreed that the forensic dental evidence proved that Gary Cifizzari's bitemarks matched those on Mrs. Schiappa's body. [ECF No. 122 ¶ 173]. Michael Cifizzari's initial confession at the Milford police station and his subsequent interrogation at the State CPAC office were not introduced at Gary Cifizzari's trial, although a witness at Gary Cifizzari's trial did reference Michael's confession once in her testimony.[5] [Id. ¶ 233; Gary Cifizzari Trial Tr. 7:5–9, ECF No. 124-4]. At the conclusion of trial, Gary Cifizzari was found guilty of first-degree murder. [ECF No. 122 ¶ 234].

Gary Cifizzari appealed his conviction, and the Massachusetts Supreme Judicial Court affirmed the judgment against him. [Id. ¶ 236; Gary Cifizzari 1986 SJC Appeal at 369]. On appeal, Plaintiff raised a number of arguments, including but not limited to, the admissibility of bitemark identification evidence; the statement of witness Annette Pasqualone referencing Michael Cifizzari's confession; introduction of the theory of joint venture; instruction of felony murder; and the prosecutor's remarks on closing argument regarding a reference to the Cifizzari brothers' smoking marijuana under a bridge after the murder. [ECF No. 122 ¶ 237; Gary Cifizzari 1986 SJC Appeal at 358]. Plaintiff did not base his appeal on any conduct by the MPD relative to Michael Cifizzari's questioning on February 26, 1981, or on evidence of Michael Cifizzari's confessions that were not introduced at trial. Nor did he argue ineffective assistance of counsel relative to the

---

[5] Plaintiff did challenge this witness' statement regarding Michael's confession in his appeal. Gary Cifizzari 1986 SJC Appeal at 364.

failure to introduce a third-party culprit defense relative to Michael Giroux or other State Police suspects. [ECF No. 122 ¶ 237].[6]

In 2006, Gary Cifizzari sought to have the physical evidence from the Schiappa murder investigation tested for DNA evidence. [ECF No. 133 ¶ 219]. In 2017, the New England Innocence Project represented Plaintiff in a renewed request to have the DNA evidence from the murder tested. [Id. ¶ 220]. Ultimately, the WCDA worked with the Innocence Project to test the physical evidence, and this DNA testing excluded Gary Cifizzari and identified Michael Giroux as the source of the semen on Mrs. Schiappa's nightgown. [Id. ¶¶ 221–22]. Plaintiff filed a Motion for a New Trial in state court in May 2019. [ECF No. 122 ¶ 239]. In December 2019, the Commonwealth entered a *Nolle Prosequi* on the count of first-degree murder. [Id. ¶ 241]. In May 2021, Gary Cifizzari and the Commonwealth of Massachusetts agreed to a settlement relative to claims brought or which could have been brought against the Commonwealth pursuant to the Massachusetts Erroneous Conviction statute. [Id. ¶ 242].

The state of forensic science has drastically changed since Gary Cifizzari's conviction, beginning around 2009, when a landmark report by the National Academy of Sciences cast serious doubt on multiple forms of forensic evidence which had previously been accepted by courts. [Gary Cifizzari Mot. for New Trial at 33]; see National Research Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009) ("NAS Report"), https://nap.nationalacademies.org/catalog/12589/strengthening-forensic-science-in-the-united-states-a-path-forward; McCrory v. Alabama, 144 S. Ct. 2483, 2484-85 (2024) (Sotomayor, J., dissenting) (discussing the import of the 2009 NAS Report, noting, "Since the NAS Report, the

_____

[6] The Court acknowledges that Plaintiff may not have raised these claims in his 1986 appeal as some of the bases for the claims did not become known until bitemark science was rejected and DNA evidence revealed Plaintiff's innocence.

scientific community has shored up some methods of forensic evidence and left others behind."). The NAS report found "no basis existed to support the proposition that a forensic odontologist, looking at a bitemark on human skin, could individualize that mark to a potential biter." [Gary Cifizzari Mot. for New Trial at 34 (citation omitted)]. Subsequent scientific evaluations of bitemark evidence have drawn similar conclusions about its unreliability, and it is now "generally accepted scientific consensus that individualization testimony is inherently unreliable." [Id. at 29, 32].

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 244. "Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment." Triumph Foods, 742 F. Supp. 3d at 69 (citing Anderson, 477 U.S. at 248). In reviewing the evidence at the summary judgment stage, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Sharp, 692 F. Supp. 3d at 10  (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). "However, '[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Fernando v. Fed. Ins. Co., No. 18-10504-MBB, 2022 U.S. Dist. LEXIS 44315, at *3 (D. Mass. Mar. 14, 2022) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). If a properly supported motion for summary judgment is submitted, the opposing party must "set forth specific facts showing that

there is a genuine issue for trial." Anderson, 477 U.S. at 250. The adverse party cannot "rest upon

the mere allegations or denials of his pleading," but must instead "present affirmative evidence."

Id. at 256–57. Inadmissible hearsay evidence cannot be considered on summary judgment for the

truth of the matter asserted. Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012). Further, opposition

to a motion for summary judgment must set forth such facts as would be admissible in evidence.

Quinones v. Buick, 436 F.3d 284, 291 (1st Cir. 2006); Fed. R. Civ. P. 56(c)(4).  "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine issue of

*material* fact." Scott, 550 U.S. at 380 (quoting Anderson, 477 U.S. at 247–48).

**B.  Article III Standing**

Article III standing "is an 'indispensable part' of any case that must be present at every

stage of the case." In re Lantus Direct Purchaser Antitrust Litig., 512 F. Supp. 3d 106, 119 (D.

Mass. 2020) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). This requirement

"assures respect for the constitutional requirement that federal court jurisdiction be limited to

actual '"Cases' and 'Controversies.'"" In re Lantus at 119 (quoting Hochendoner v. Genzyme

Corp., 823 F.3d 724, 731 (1st Cir. 2016) (citing U.S. Const. art. III, § 2, cl. 1)). The "irreducible

constitutional minimum of standing contains three elements." Lujan, 504 U.S. at 560. First, the

plaintiff must have suffered an "injury in fact," that is both "(a) concrete and particularized[,]" and

"(b) actual or imminent, not 'conjectural' or hypothetical[.]'" Id. Second, the injury must be "fairly

traceable" to "the challenged action of the defendant." Id. Third, it must be "likely" that the injury

will be "redressed by a favorable decision." Id. at 560–61 (citation omitted). "[T]he plaintiff bears

the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring

the action . . . Neither conclusory assertions nor unfounded speculation can supply the necessary heft." Hochendoner, 823 F.3d at 731.

The fairly traceable element of Article III standing requires that the injury be "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] independent action of some third party not before the court.'" Lujan, 504 U.S. at 560 (alterations in original) (quoting Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 41–42 (1976)). "When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." Lujan, 504 U.S. at 561–62. Further, when "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" Lujan, 504 U.S. at 562 (citing Warth v. Seldin, 422 U.S. 490, 505 (1975)).

### III.    DISCUSSION

Summary judgment hinges on whether there is a genuine dispute as to *material* facts, as well as on whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The evidence and events proposed by the Plaintiff are supported largely by hearsay evidence and do not have other record support that was contemporaneous to the time of the murder and investigation. While these accounts of alternative theories and potential uninvestigated leads are provocative and concerning, they are ultimately not material because, as discussed further below, Plaintiff's claims fail as a matter of law based on his inability to demonstrate causation.

There are a few undisputed material facts at play here. First, a state statute required the murder investigation to be overseen and directed by the WCDA and the CPAC unit of the State Police rather than the local MPD. Mass. Gen. Laws ch. 38, § 4. While Plaintiff may dispute the level of involvement of individual MPD officers, it is undisputed that WCDA was the agency that was overall responsible for conducting the Schiappa murder investigation and that a CPAC unit detective was the lead investigator. [ECF No. 122 ¶¶ 4, 8, 10–11]. Second, the key event which triggered Plaintiff's prosecution occurred during a CPAC, as opposed to MPD, interrogation. It is undisputed that Gary Cifizzari was not implicated in the investigation of the murder of Mrs. Schiappa until his brother Michael falsely stated in his second confession at the CPAC office in Worcester that Gary was with him when he committed the murder. [Id. ¶¶ 93–94]. It is undisputed that the second confession was conducted by Sgt. Doheny of CPAC at the CPAC office in Worcester, and that no MPD officers asked Michael any questions. [Id. ¶¶ 150–51]. Third, Plaintiff Gary Cifizzari was primarily convicted based on bitemark evidence. It is undisputed that in his 2019 Motion for New Trial, Plaintiff asserted, "[t]he Commonwealth's case against Mr. [Gary] Cifizzari was predicated entirely on 'expert' bitemark comparison testimony;" and that "[t]he case against [Gary] Cifizzari began and ended with bitemark comparison evidence in the form of expert testimony." [Id. ¶ 221; Gary Cifizzari Mot. for New Trial at 14]. It is undisputed that the State Police controlled the use of the bitemark evidence, and Plaintiff does not counter that "[t]he Town of Milford and members of its Police Department did not direct, control or participate in any aspect of securing, assessing, evaluating or utilizing as evidence the dental evidence, from the initiation of the murder investigation through the conviction of Gary Cifizzari." [ECF No. 122 ¶ 207]. It is undisputed that Plaintiff was indicted following confirmation of Dr. Souviron's expert dental opinion that Plaintiff's teeth made the marks on Mrs. Schiappa's body. [Id. ¶ 218]. It is undisputed

that the WCDA controlled the prosecution and presented the dental experts who testified at Plaintiff's trial that Plaintiff's dental impression matched the bitemarks on Mrs. Schiappa's body. [Id. ¶ 222; Gary Cifizzari 1986 SJC Appeal at 360]. It is undisputed that Plaintiff entered into a \$1 million settlement with the Commonwealth of Massachusetts, which includes the WCDA and the State Police, where Plaintiff released the Commonwealth from any of all claims which were brought, or which could have been brought pursuant to the Massachusetts Erroneous Conviction statute. [Settlement Agreement, ECF No. 118-3 at 181]. MPD and its officers were not parties to the settlement. [Id.]

As will be discussed below, these undisputed material facts entitle the Defendants to judgment as matter of law on Plaintiff's Section 1983 claims because the facts controvert Plaintiff's attempt to establish causation. The success of Plaintiff's claim under the Massachusetts Civil Rights Act depends on whether Plaintiff can establish Defendants' interference or attempted interference with civil rights "by threats, intimidation or coercion" in Michael Cifizzari's confession, which, as will be explained in Section III.C of this opinion, the Court finds Plaintiff lacks standing to challenge. See Mass. Gen. Laws Ann. ch. 12, § 11H.

### A. **Michael Cifizzari's Confessions**

Plaintiff challenges prior court rulings that Michael Cifizzari's confessions were uncoerced and voluntary. As stated above, Michael Cifizzari's attorney did bring a motion to suppress his confession at the Milford Police Department on February 26, 1981. This motion was denied after a two-day evidentiary hearing, and was denied again on appeal. [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983) at 194; Cifizzari, 474 N.E.2d at 1177]. As this is a wrongful conviction case with the benefit of hindsight, it is clear that Michael's statements at his confession were false. However, this Court cannot replace the rulings of the judges hearing the evidence and argument

on the motion to suppress at the time these events unfolded. While Michael's statements do not reflect the truth, that does not require a finding that his confession was coerced or involuntary.

Defendants assert that Plaintiff Gary Cifizzari is issue precluded from relitigating in this action whether Michael's confession at the Milford Police Department was coerced. "[A] party to a civil action against a former criminal defendant may invoke the doctrine of collateral estoppel to preclude the criminal defendant from relitigating an issue decided in the criminal prosecution." Aetna Cas. & Sur. Co. v. Niziolek, 481 N.E.2d 1356, 1360 (Mass. 1985). In other words, in some cases, a defendant in a Section 1983 action may invoke issue preclusion to preclude the plaintiff who was criminally prosecuted from relitigating an issue that was decided in their criminal prosecution. "Under Massachusetts law, issue preclusion (or collateral estoppel) is appropriate where there is 'an identity of issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or tribunal of competent jurisdiction.'" Kyricopoulos v. Orleans, 967 F.2d 14, 16 (1st Cir. 1992) (per curiam) (quoting Miles v. Aetna Cas. & Sur. Co., 589 N.E.2d 314, 317 (Mass. 1992)). Here, Plaintiff Gary Cifizzari is seeking to challenge his brother Michael's confession, which was a main issue in Michael's rather than Gary's prosecution. "Massachusetts no longer requires mutuality of parties to invoke issue preclusion. Thus, where the party in whose favor collateral estoppel is to be applied was not a litigant in the original action, the central inquiry is whether the party against whom issue preclusion will be applied had a fair opportunity to litigate the issue fully or whether reasons exist to afford the party a chance to relitigate the issue." Kyricopoulos, 967 F.2d at 16 (citing Brunson v. Wall, 541 N.E.2d 338, 341 (Mass. 1989)).

There are certainly some reasons that go against precluding Plaintiff from contesting Michael's confession; however, the Court need not reach the issue because Plaintiff has failed to demonstrate a causal link between the actions of the MPD Defendants and his own wrongful

conviction. While Gary Cifizzari may not be issue precluded from contesting the voluntariness of his brother Michael's confession to either the MPD or the State Police, he lacks standing to raise such a challenge. First, while a defendant has a Fifth Amendment right to seek suppression of his own confessions, "the privilege against self-incrimination is personal to a defendant," and "a co-defendant cannot object to the admission of a confessing defendant's inculpatory statement on the ground that the confessing defendant's Fifth Amendment rights were violated." United States v. Robinson-Munoz, 961 F.2d 300, 303 (1st Cir. 1992) (citing Moran v. Burbine, 475 U.S. 412, 433 (1986)). In some circumstances, a defendant may have a valid objection to the inclusion of a co-defendant's statement at his trial based on the Confrontation Clause and the Bruton rule. See id. at 303 n.2; Bruton v. United States, 391 U.S. 123, 128–37 (1968). However, that is not the circumstance of the motion before the Court.

Even more general principles of standing indicate that Plaintiff cannot meet the causation requirement of the injury-in-fact prong of a standing analysis – that the injury be "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] independent action of some third party not before the court.'" Lujan, 504 U.S. at 560 (quoting Simon, 426 U.S. at 41–42). It is undisputed that Plaintiff was not implicated in the murder until Michael Cifizzari was interrogated by Sgt. Doheny *of the State Police CPAC unit at the CPAC office in Worcester*, and that MPD officers did not question Michael Cifizzari at that interrogation  – only Sgt. Doheny asked questions. [ECF No. 122 ¶¶ 150–51, 159]. Therefore, the infirmity that Plaintiff complains of in Michael Cifizzari's confession cannot be attributed to the MPD Defendants, but rather to the independent actions of the State Police, who are third parties not before the Court. See Lujan, 504 U.S. at 560 (quoting Simon, 426 U.S. at 41–42). Accordingly, the Court will not disturb the findings of the state courts that presided over Michael Cifizzari's motion to suppress and appeal

of his conviction. [See Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983); Cifizzari, 474 N.E.2d at 1177 (finding no error in trial court's denial of motion to suppress statements; "Commonwealth had sustained its burden of proving that the defendant's confession was voluntary and was based on a knowing and intelligent waiver of Miranda rights.").

### B. 42 U.S.C. § 1983

Plaintiff brings nine claims under 42 U.S.C.§ 1983 ("Section 1983"), including unduly suggestive, biased, and otherwise improper identification procedures (Count 1), improper interrogation procedures and techniques (Count 2), fabricating false inculpatory evidence (Counts 3 and 4), failure to investigate (Count 5), malicious prosecution (Count 6), a Monell claim (Count 7), supervisory liability (Count 8), and conspiracy (Count 9). Section 1983 "creates a private right of action against any person who, under color of state law, 'subjects, or causes to be subjected, any . . person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]'" Yaghoobi v. Tufts Med. Ctr., Inc., 762 F. Supp. 3d 85, 92 (D. Mass. 2025) (alterations in original) (citing 42 U.S.C § 1983). "A claim under Section 1983 has two elements: 1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." Yaghoobi, 762 F. Supp. 3d at 92 (citation omitted). "To satisfy the second element, plaintiffs must show that the defendants' conduct was the cause in fact of the alleged deprivation." Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997). Section 1983 "imposes a causation requirement similar to that of ordinary tort law." Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 831 (1st Cir. 1987); see Rodriguez-Cirilo, 115 F. 3d  at 52 ("In applying basic tort principles to the facts raised by a particular section 1983 claim, the causation requirement may be fleshed out with reference to state law tort principles.").

## 1.  **John  Doe Defendants**

Plaintiff brings Counts I-II, V-VI, & VIII-X against John Doe Defendants 1-20. Plaintiff has made no effort to name "John Does 1 – 20" or serve them with the Complaint or Amended Complaint. "Because these fictitiously named parties remained unidentified at the close of discovery," and because summary judgment is ripe for resolution, the claims against John Does 1–20 are hereby **DISMISSED**. Silva v. Town of Uxbridge, 771 F. Supp. 3d 56 n.1 (D. Mass. 2025); Figueroa v. Rivera, 147 F.3d 77, 82–83 (1st Cir. 1998) (affirming dismissal of claims against John Doe defendants because plaintiff made no attempt to serve them with the complaint and summary judgment was ripe for resolution).

## 2.  **Counts I, II, & III**

Counts I, II, and III all pertain to Michael Cifizzari's confession at the Worcester CPAC office.  Count I asserts a claim of unduly suggestive, biased, and otherwise improper identification procedures against the MPD Defendants. Count II asserts a claim of improper interrogation procedures and techniques against the MPD Defendants. Count III asserts a claim of fabrication of false inculpatory evidence against the MPD Defendants. As stated above, Plaintiff Gary Cifizzari cannot establish standing for these claims against the MPD Defendants because his alleged injuries are not fairly traceable to them given that Sgt. Doheny of the State Police, rather than any MPD officer, conducted the interrogation where Michael Cifizzari implicated Plaintiff. [ECF No. 122 ¶¶ 150–51, 159]; see Lujan, 504 U.S. at 560 (quoting Simon, 426 U.S. at 41–42).

For Count I, Plaintiff alleges the improper identification procedures utilized included "[q]uestioning and interrogating Michael Cifizzari" in "deteriorated mental state" and "asking Michael suggestively whether he was sure he had been with his cousin, and not his brother . . . at the time of the crime." [Am. Compl. ¶ 70]. Count II accuses the MPD Defendants of "interrogating

and questioning the severely mentally ill Michael Cifizzari, then later implicating the Plaintiff in the murder in additional interrogations." [Id. ¶ 74]. In Count III, Plaintiff alleges the MPD Defendants "fabricated inculpatory evidence" in Michael's confession, essentially asserting that the Defendants fabricated Michael's confession. [Id.] In addition to lacking standing, Plaintiff's claims in Counts I, II, and III substantively fail because Plaintiff cannot establish the element of causation. To establish causation for a claim under Section 1983, a plaintiff "must show that the defendants' conduct was the cause in fact of the alleged deprivation." Rodriguez-Cirilo, 115 F.3d at 52. The MPD Defendants did not ask any questions at Michael's CPAC office interrogation. [ECF No. 122 ¶ 151]. It was Sgt. Doheny who asked Michael Cifizzari if he was sure it was his cousin that was with him during the murder and not his brother Gary, to which Michael replied, "Yes, Gary was there." [Id. ¶ 143; ECF No. 131 ¶ 102; May 7, 1981 State Police Report ¶ 4]. To the extent Plaintiff's allegations in Count III refer to Michael's first interrogation at the MPD station,[7] Plaintiff was not implicated at all during that interrogation and his injuries are not traceable to Michael's statements made therein.

Plaintiff cites four out-of-circuit cases to argue that causation is met for his Section 1983 claims because the MPD Defendants "set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of [his] constitutional rights." [ECF No. 127 at 53 (quoting Conner v. Reinhard, 847 F.2d 384, 397 (7th Cir. 1988))]. Plaintiff's argument has two flaws. First, Plaintiff's wrongful conviction was not a foreseeable result of the MPD Defendants' interrogation of Michael Cifizzari at the MPD station in February 1981. The MPD Defendants did not raise Plaintiff's name in their conversation with Michael

---

[7] The Amended Complaint is unclear as to which interrogation Plaintiff is challenging: Michael's first interrogation at the MPD station or Michael's interrogation at CPAC. [See Am. Compl. ¶¶ 78–80].

Cifizzari, nor does the record suggest that Sgt. DiGirolamo and Officer Chianese took any action to implicate Plaintiff in Michael's statements. There is no evidence in the record that the MPD Defendants told Sgt. Doheny to ask Michael whether Plaintiff was involved in the murder, rather it appears that Sgt. Doheny acted independent of his own accord. While a "defendant will not be relieved of liability by an intervening cause that was reasonably foreseeable, even if the intervening force may have directly caused the harm," a defendant is "shield[ed]" from liability if "an unforeseen and abnormal intervention . . . breaks the chain of causality." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989) (internal quotation marks and citations omitted). Second, Plaintiff was primarily convicted based on bitemark evidence, and it is undisputed that "[t]he Town of Milford and members of its Police Department did not direct, control or participate in any aspect of securing, assessing, evaluating or utilizing as evidence the dental evidence, from the initiation of the murder investigation through the conviction of Gary Cifizzari." [ECF No. 122 ¶ 207]. Moreover, CPAC investigators had already decided that bitemark evidence might be used in a future criminal prosecution for Mrs. Schiappa's murder a full seventeen months prior to Michael's interrogation in Milford, when the State Police contacted Dr. Schwartz to attend the victim's autopsy on September 29, 1979 and make dental impressions of the bitemarks on her body. [Id. ¶¶ 40–44]. Therefore, while the MPD Defendants' interrogation of Michael Cifizzari does form part of the chain of events that implicated Plaintiff in Mrs. Schiappa's murder, it is not the proximate cause of Plaintiff's wrongful conviction.

The Court pauses to note that Plaintiff – at best – erroneously confuses and – at worst – intentionally conflates the actions of the MPD Defendants and the State Police investigators in a manner that improperly portrays the MPD Defendants as having a more active role in the murder investigation and Plaintiff's prosecution than is supported by the record. [See e.g., ECF No. 131

¶¶ 82, 86 (Plaintiff incorrectly citing testimony relating to the State Police interrogation of Michael and attributing it to Sgt. DiGirolamo's interview of Michael at the MPD station); <u>compare</u> Am. Compl. ¶¶ 42 ("Along with Milford Police Sgt. DiGirolamo, Milford Officers Chianese and Nicholas Sullo, Sergeant Doheny began questioning Michael about his statements and asked Michael whether he was sure he had been with his cousin, and not his brother Gary, at the time of the crime") <u>with</u> ECF No. 122 ¶ 151 (Not disputed that "The Milford Police did not question Michael Cifizzari at the CPAC office, only Sgt. Doheny.")]. Despite this sleight of hand, the picture remains clear as to the material undisputed facts at issue. The MPD Defendants did not cause Plaintiff's injuries for Counts I through III. Accordingly, summary judgment is **<u>GRANTED</u>** on Counts I-III.

### 3.  <u>Count IV</u>

Count IV asserts a fabrication of false inculpatory evidence claim against Richard Souviron, the dental expert who gave the opinion that Plaintiff's teeth made the marks on Mrs. Schiappa's body. [ECF No. 122 ¶ 218]. Plaintiff failed to name Dr. Souviron as a defendant in the Amended Complaint caption, Dr. Souviron was never served with notice of this action, and no attorney has filed an appearance on behalf of Dr. Souviron. Additionally, the allegations for Count IV in the Amended Complaint are verbatim copy and pasted from Count III and refer only to the actions of the MPD Defendants. Because Plaintiff failed to serve Dr. Souviron in accordance with the Federal Rules of Civil Procedure, and because Plaintiff has failed to allege any facts that would form a basis for his claim against Dr. Souviron, summary judgment is **<u>GRANTED</u>** as to Count IV.

### 4.  <u>Count V</u>

Count V asserts a claim of failure to investigate against the MPD Defendants. "[T]he First Circuit has recognized that a duty to investigate may arise in certain circumstances even when an

officer has obtained facts that would otherwise be sufficient to establish probable cause." Abubardar v. Gross, 542 F. Supp. 3d 69, 75 (D. Mass. 2021) (citing Chapman v. Finnegan, 950 F. Supp. 2d 285, 296 (D. Mass. 2013)). Here, the Court finds that Michael Cifizzari's confession at the CPAC office implicating Plaintiff, and the expert opinions that affirmatively (albeit erroneously) linked Plaintiff's bite impression to the bitemarks on the victim's body would have been enough to establish probable cause for his arrest. Still, Plaintiff argues that the Defendants ignored other leads and evidence that would have led them to identifying Michael Giroux as the real killer, thus ruling out Plaintiff as a suspect.

To show that the MPD Defendants had a duty to conduct further inquiry under the circumstances, Plaintiff must allege that the information known to the Milford Police gave those officers "an obvious reason to doubt" that Plaintiff had committed the murder of Mrs. Schiappa, such that the officers' failure to conduct an additional inquiry "evinced a reckless disregard for the truth." Abubardar, 542 F. Supp. 3d at 75 (quoting United States v. Tanguay, 787 F.3d 44, 53-54 (1st Cir. 2015)). To meet the standard for "reckless disregard for the truth," "'negligence or innocent mistake [is] insufficient.'" Tanguay, 787 F.3d at 52 (alterations in original) (quoting United States v. Davis, 617 F.2d 677, 694 (D.C. Cir. 1979)). Generally, "[t]he failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth." Tanguay, 787 F.3d at 51-52 (citations omitted).  Liability for failure to investigate only applies when Plaintiff can establish an "affirmative link" between the "alleged investigatory deficiency and [the police officer's] violation of [the plaintiff's] constitutional rights[.]" Aldrich v. Town of Milton, 881 F. Supp. 2d 158, 173 (D. Mass. 2012) (quoting Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 95 n.11 (1st Cir. 1994)).

Count V fails because Plaintiff cannot establish the first step of the failure to investigate analysis, which requires that the defendant was under a duty to investigate further. See Tanguay, 787 F.3d at 54 ("[T]he court must first determine whether the information known to [the law enforcement officer] gave [them] an obvious reason to doubt [the truthfulness of another witness's statements] and, thus, triggered a duty of further inquiry."). Plaintiff objects to the characterization that the MPD officers did not direct and control the Schiappa murder investigation, and alleges that individual actions by Defendants DiGirolamo, Chianese, Liberto, and Small show they retained some direction over the investigation. [See ECF No. 122 ¶¶ 59–68]. The Court has already concluded that that the WCDA and CPAC directed and controlled the murder investigation and Plaintiff's subsequent prosecution. See Section I.B. "Control of the Murder Investigation," supra. Further, in an affidavit, Trooper Meier of CPAC testified that the MPD "did not coordinate, direct or control the Schiappa homicide investigation" and that "[i]nstead, Milford Police detectives were assigned discrete tasks by CPAC investigators, such as accompanying CPAC investigators during interviews." [Meier Aff. ¶ 13]. Trooper Meier's assertion is not hearsay, but rather a fact statement based on his personal knowledge of how the investigation was conducted, given that he was assigned to investigate the Schiappa murder as part of the CPAC unit in 1979. [Id. ¶ 5]. Meier's characterization of the control over the investigation is also supported by state law. See Mass. Gen. Laws ch. 38, § 4. There is no evidence in the record that the State Police or WCDA even shared information about their investigation of the Plaintiff with the MPD officers. Given that MPD did not control the investigation and the MPD Defendants had a limited role in accompanying CPAC investigators on local interviews, the Court does not find that the MPD Defendants were under a duty to investigate further than what they were asked to do by CPAC. Additionally, the record reflects that MPD officers did report some of the purported uninvestigated leads to the CPAC

investigators, such as the statement of Gary Terhune. [See 1979 State Police Report ¶ 10; ECF No. 122 ¶ 69; ECF No. 131 ¶ 160]. As Plaintiff cannot show that the MPD Defendants had a duty to investigate further, the Defendants are entitled to summary judgment as a matter of law on Count V.

### 5. <u>Count VI</u>

Count VI asserts a claim of malicious prosecution against the MPD Defendants. To prevail on a Section 1983 malicious prosecution claim, "a plaintiff must meet the common law elements" of the claim "and additionally demonstrate 'a deprivation of a federally-protected right.'" <u>Watson v. Mita</u>, 396 F. Supp. 3d 220, 224 (D. Mass. 2019) (quoting <u>Nieves v. McSweeney</u>, 241 F.3d 46, 53 (1st Cir. 2001)). Under Massachusetts common-law, the elements of a malicious prosecution require, "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice.'" <u>Watson</u>, 396 F. Supp. 3d at 225 (internal quotation marks and citations omitted). Further, a plaintiff "must establish that a named defendant commenced or continued the criminal proceedings against the Plaintiff . . . and must show that the defendant acted with 'improper purpose.'" <u>Id.</u> (citations omitted). A plaintiff suing pursuant to Section 1983 "must do more than merely satisfy the elements of the common law tort of malicious prosecution[,]" they "'must show a deprivation of liberty, pursuant to legal process, that is consistent with the concept of a Fourth Amendment seizure.'" <u>Id.</u> at 224 (quoting <u>Harrington v. City of Nashua</u>, 610 F.3d 24, 30 (1st Cir. 2010)).

Plaintiff's malicious prosecution claim against the MPD Defendants must fail because the WCDA and the Massachusetts State Police instituted or commenced the criminal proceedings against Plaintiff, not the MPD Defendants. As discussed already at length, the WCDA and CPAC

directed and controlled the murder investigation and Plaintiff's subsequent prosecution. See Section I.B. "Control of the Murder Investigation," supra.  As no evidence has been presented to demonstrate that MPD officers, rather than the WCDA and CPAC investigators, were responsible for the Plaintiff's prosecution, Plaintiff cannot meet the first element of the claim and summary judgment on Count VI is **GRANTED**.

### 6.  Count VIII

Count VIII asserts a supervisory liability claim against the MPD Defendants. Supervisory liability under Section 1983 has two elements. First, "the plaintiff must show that one of the supervisor's subordinates abridged the plaintiff's constitutional rights." Guadalupe-Báez v. Pesquera, 819 F.3d 509, 514 (1st Cir. 2016) (citing Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)). Second, "the plaintiff must show that the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." Pesquera, 819 F.3d at 515 (alterations in original) (citations omitted). The First Circuit is clear that "a supervisor may not be held liable under section 1983 on the tort theory of respondeat superior[.]" Id. Further, a supervisor's section 1983 liability cannot "rest solely on his position of authority[.]" Id.

Plaintiff's claim fails on the first element: as detailed above, the Court finds that no subordinate MPD officer violated Plaintiff's constitutional rights. Because Plaintiff cannot show that behavior of a subordinate resulted in a constitutional violation, there can be no supervisory liability. See Pineda, 533 F.3d at 54. Summary judgment is **GRANTED** as to Count VIII.

### 7.  Count VII

Count VII asserts a <u>Monell</u> liability claim against the Town of Milford and the MPD Defendants for failing to properly discipline, supervise, and train MPD officers. While municipalities, including their police departments, can be sued under Section 1983, they cannot be held liable on a respondeat superior theory for the actions of their employees. <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 691 (1978). Instead, a plaintiff must show that the municipality had a policy or custom that was the moving force behind the constitutional violation. <u>Id.</u> <u>Monell</u> liability is contingent on an underlying constitutional violation, and "if there is no underlying constitutional violation, there can be no municipal liability." <u>Johnson v. City of Biddeford</u>, 665 F. Supp. 3d 82, 122 (D. Me. 2023); <u>see</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) (per curiam) ("[N]either [Monell] nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm."); <u>Evans v. Avery</u>, 100 F.3d 1033, 1040 (1st Cir. 1996) ("[W]e follow Heller's clear rule and hold that the City cannot be held liable absent a constitutional violation by its officers.").

As the Court has found the MPD Defendants have not committed an underlying constitutional violation, the City cannot be held liable under <u>Monell</u>, and summary judgment is **<u>GRANTED</u>** as to Count VII.

### 8.  <u>Count IX</u>

Count IX asserts a conspiracy claim against the MPD Defendants. There are several causes of action for conspiracy under state and federal law. Plaintiff has pleaded this claim as a civil rights conspiracy under Section 1983. "A civil rights conspiracy as commonly defined is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a

wrong against or injury upon another, and an overt act that results in damages.'" Est. of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (citation omitted). While agreement may be demonstrated with circumstantial evidence, Plaintiff has failed to allege any facts regarding an agreement between the defendants that rises above "speculation and conjecture." See Martinez v. City of Worcester, 502 F. Supp. 3d 606, 619 (D. Mass. 2020) (citation omitted). Indeed, even considering Plaintiff's primary theory regarding Defendants' alleged fabrication of Michael Cifizzari's confession, Plaintiff himself asserts that it is "[n]ot disputed" that "Defendants DiGirolamo and Chianese did not discuss their plans to interrogate Michael Cifizzari before they did so on February 26, 1981." [ECF No. 122 ¶ 106].

As Plaintiff has presented no evidence of an agreement among Defendants from which a reasonable jury could have inferred a conspiracy among them to inflict harm upon Plaintiff, summary judgment is **GRANTED** as to Count IX.

### C.  Count X: Massachusetts Civil Rights Act

Count X asserts a violation of the Massachusetts Civil Rights Act ("MCRA") against the MPD Defendants. To bring a claim under the MCRA, a plaintiff "must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion." Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 309 (D. Mass. 2017) (citation omitted). "[T]he MCRA is narrower than § 1983 in that it limits its remedy to conduct that interferes with a secured right 'by threats, intimidation or coercion[,]' . . . even a direct deprivation of a plaintiff's rights 'would not be actionable under the act unless it were accomplished by means of one of these three constraining elements.'" Id. at 309–10. "Other than the additional requirement that an interference or attempted

interreference was by threats, intimidation, or coercion, 'the [MCRA] is generally interpreted coextensively with' Section 1983." Renzullo v. Town of Wakefield, No. 20-cv-11961-DJC, 2023 U.S. Dist. LEXIS 32755, at *31 (D. Mass. Feb. 28, 2023) (alterations in original) (quoting Diaz v. Devlin, 229 F. Supp. 3d 101, 112 (D. Mass. 2017)).

Plaintiff fails to allege that the MPD Defendants violated his rights by subjecting him to "threats, intimidation, or coercion," and he likewise fails to establish an MCRA violation based on the MPD Defendants' use of "threats, intimidation, or coercion" against a third party. Plaintiff alleges that the MPD Defendants violated the MCRA by "conducting a sham investigation of the actual perpetrator, Giroux, coaching, coercing or otherwise fabricating evidence against the Plaintiff, or causing witnesses to give statements and/or testimony that would result in his misidentification," or by offering false statements and testimony. [Am. Compl. ¶ 105]. None of these actions constitute "threats, intimidation, or coercion" against Plaintiff directly. In some instances, a defendant's coercion of a third party, such as witness, to induce them to fabricate a false identification can suffice to demonstrate the requirement of coercion. See Echavarria v. Roach, No. 16-cv-11118-ADB, 2017 U.S. Dist. LEXIS 144589, at *42 (D. Mass. Sep. 7, 2017). However, this theory still requires causation that the defendant's actions harmed the Plaintiff. See Redgrave v. Bos. Symphony Orchestra, Inc., 502 N.E.2d 1375, 1378–80 (Mass. 1987) (discussing the circumstances in which a defendant's actions against a third party suffice for liability under the MCRA). Here, the third party is Michael Cifizzari, and Plaintiff alleges the MPD Defendants coerced Michael into falsely identifying Plaintiff. As stated repeatedly, Plaintiff was not identified Michael's interrogation at the MPD station. Plaintiff was only implicated in the murder during Michael's CPAC interrogation, which Sgt. Doheny conducted and where no MPD officer asked any questions. [ECF No. 122 ¶¶ 150–51]. Additionally, the Court has found that Plaintiff lacks

standing to contest the prior state court rulings that Michael's confession to the MPD was not the product of coercion. As Plaintiff has not demonstrated "threats, intimidation or coercion" by the MPD Defendants, and because he cannot show causation for his claim, summary judgment is **GRANTED** as to Count X.

### D.  Qualified Immunity

As the Court is granting summary judgment on all counts, it declines to reach the merits of whether any MPD Defendant would be shielded by qualified immunity.

## IV.  CONCLUSION

The Court acknowledges the substantial harm that Gary Cifizzari endured as a result of his wrongful conviction; however, it cannot grant relief that the law does not support. To do so would only compound the injustice surrounding this case. For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 117, is **GRANTED** on all counts and the case is **DISMISSED.**

**SO ORDERED.**

Dated: July 9, 2025

        /s/ Margaret R. Guzman
        Margaret R. Guzman
        United States District Judge